**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONNA R. HUDNELL,** | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **No. 2:20-cv-01621-GJP** |
| | : | |
| **THOMAS JEFFERSON UNIVERSITY** | : | **JURY TRIAL DEMANDED** |
| **HOSPITAL,** | : | |
| **Defendant.** | : | |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2021, upon consideration of

Defendant's Motion for Summary Judgment and Plaintiff's opposition thereto, if any, it is hereby

ORDERED and DECREED that Defendant's Motion is GRANTED and JUDGMENT is entered

in favor of Defendant on all remaining claims asserted in Plaintiff's Third Amended Complaint.

It is FURTHER ORDERED that the Clerk of Court shall mark this case closed for

statistical purposes.

**BY THE COURT:**

_____
**PAPPERT, J.**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DONNA R. HUDNELL,** | : |
| **Plaintiff,** | : |
| | : |
| | :     **CIVIL ACTION** |
| **v.** | : |
| | :     **No. 2:20-cv-01621-GJP** |
| | : |
| **THOMAS JEFFERSON UNIVERSITY HOSPITAL,** | :     **JURY TRIAL DEMANDED** |
| | : |
| **Defendant.** | |

## THOMAS JEFFERSON UNIVERSITY HOSPITAL'S
## MOTION FOR SUMMARY JUDGMENT

Defendant Thomas Jefferson University Hospital hereby moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. In support of its Motion, Defendant relies upon the accompanying Memorandum of Law in Support, Statement of Undisputed Material Facts, and exhibits thereto, the contents of which are incorporated by reference herein as if set forth in full.

Respectfully submitted,

**FISHERBROYLES, LLP**

Dated: July 7, 2021         By:    */s/ Sidney R. Steinberg*

Sidney R. Steinberg
sidney.steinberg@fisherbroyles.com
333 E. Lancaster Ave. #321
Wynnewood, Pa. 19096
610-806-5060

David E. Renner
david.renner@fisherbroyles.com
5990 University Boulevard, Box 148
Moon Township, PA 15108
412-746-1720

*Counsel to Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONNA R. HUDNELL, | : | |
| Plaintiff, | : | |
| | : | **CIVIL ACTION** |
| v. | : | |
| | : | No. 2:20-cv-01621-GJP |
| THOMAS JEFFERSON UNIVERSITY HOSPITAL, | : | **JURY TRIAL DEMANDED** |
| Defendant. | : | |

## THOMAS JEFFERSON UNIVERSITY HOSPITAL'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**FISHERBROYLES, LLP**

Sidney R. Steinberg
sidney.steinberg@fisherbroyles.com
333 E. Lancaster Ave. #321
Wynnewood, Pa. 19096
610-806-5060

David E. Renner
david.renner@fisherbroyles.com
5990 University Boulevard, Box 148
Moon Township, PA 15108
412-746-1720

*Counsel to Defendant*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ................................................................................................... ii

I.   HUDNELL'S CLAIM THAT SHE WAS DENIED A REASONABLE
     ACCOMMODATION UNDER THE PHRA AND PFPO FAILS
     AS A MATTER OF LAW ..................................................................................................... 2

     A.   Hudnell's positive UDS rendered her not "otherwise qualified" for employment ....... 6

     B.   Hudnell's post-test request for leniency is not a reasonable accommodation .............. 9

     C.   Hudnell's "request" for part-time work fails at every turn ......................................... 10

     D.   Hudnell's request for part-time work was a sham ...................................................... 11

     E.   Jefferson provided Hudnell the accommodation of an extended leave of absence .... 12

     F.   Conversion of a full-time position to part-time position is not a reasonable
          accommodation ........................................................................................................... 13

     G.   Hudnell was responsible for the breakdown in the interactive process ..................... 14

     H.   Hudnell has no evidence that she was retaliated against for requesting a "reasonable
          accommodation" .......................................................................................................... 16

II.  HUDNELL'S EXPIRED CERTIFICATION REMOVES HER FROM
     THE PROTECTION OF THE MEDICAL MARIJUANA ACT ......................................... 18

III. HUDNELL HAS NO EVIDENCE THAT RACE PLAYED A ROLE IN HER
     TERMINATION ............................................................................................................... 21

IV.  CONCLUSION ................................................................................................................. 25

## Cases

*Ahern v. EResearch Tech., Inc.*, 183 F. Supp. 3d 663 (E.D. Pa. 2016) ............................................. 2

*Allen v. Bake-Line Prods., Inc.*, No. 98 Civ. 1119, 2001 U.S. Dist. LEXIS 17103 (N.D. 111. Oct. 17, 2001).......................................................................... 24

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3d Cir. 1996)........................................... 24

*Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240 (3d Cir. 2006)). ............................. 11

*Belles v. Wilkes-Barre Area Sch. Dist.*, 843 F. App'x 437 (3d Cir. 2021) .................................. 16

*Bey v. Wash. Metro. Area Transit Auth.*, 341 F. Supp. 3d 1 (D.D.C. 2018)................................ 9

*Burrows v. Twp. of Logan*, 415 F. App'x 379 (3d Cir. 2011) ..................................................... 24

*Buskirk v. Apollo Metals*, 307 F.3d 160 (3d Cir. 2002) .............................................................. 13

*Capps v. Mondelez Glob., LLC*, 847 F.3d 144 (3d Cir. 2017) ..................................................... 11

*Colwell v. Rite Aid Corp.*, 602 F.3d 495 (3d Cir. 2010) ............................................................. 15

*Commonwealth v. Handley*, 213 A.3d 1030 (Pa. Super. 2019) .................................................. 19

*Commonwealth v. Jezzi*, 208 A.3d 1105 (Pa. Super. 2019) ........................................................ 19

*Commonwealth v. Waddell*, 61 A.3d 196 (Pa. Super. 2012) ...................................................... 19

*Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135 (3d Cir. 2004).................................... 13

*Copeland v. Philadelphia Police Dept.*, 840 F.2d 1139 (3d Cir. 1988)........................................ 7

*Detz v. Greiner Industries, Inc.*, 346 F.3d 109 (3d Cir. 2003)..................................................... 22

*Dici v. Commw. Pa.*, 91 F.3d 542 (3d Cir. 1996) ......................................................................... 2

*Donahue v. CONRAIL*, 224 F.3d 226 (3d Cir. 2000) .................................................................... 8

*Fischer v. Pepper Hamilton LLP*, 2016 U.S. Dist. LEXIS 10603 (E.D. Pa. 2016)................. 7, 11

*Garner v. Sch. Dist. of Phila.*, 63 F. Supp. 3d 483 (E.D. Pa. 2014............................................. 11

*Gass v. 52nd Judicial Dist., No. 118 MM* 2019, 236 A.3d 706 (Pa. June 18, 2020) ................... 19

*Gaul v. Lucent Techs., Inc.*, 134 F.3d 576 (3d Cir. 1998) ........................................................... 14

*Hairston v. Runyon*, 1997 U.S. Dist. LEXIS 19782 (E.D. Pa. 1997) ......................................... 22

*Harrisburg Area Cmty. Coll. v. Pa. Human Rels. Comm'n*, 245 A.3d 283, 2020 Pa. Commw. LEXIS 722 (Pa. Cmwlth. 2020) ................................................................................ 6

*Hudnell v. Thomas Jefferson Univ. Hosps., Inc.*, 2021 U.S. Dist. LEXIS 2610 (E.D. Pa. 2021) ................................................................................................ 5, 6

*Humphries v. City Univ. of New York*, No. 13 Civ. 2641, 2013 U.S. Dist. LEXIS 169086 (S.D.N.Y. Nov. 26, 2013) .............................................................. 24

*Jones v. Children's Hosp. of Phila.*, 2019 U.S. Dist. LEXIS 107347 (E.D. Pa. 2019) .................. 2

Jones v. Nationwide Life Ins. Co., 696 F.3d 78 (1st Cir. 2012) ........................................... 10, 18

*Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403 (3d Cir. 1999) ............................................. 21

*Joseph v. Cont'l Airlines, Inc.*, 126 F. Supp. 2d 373 (E.D. Pa. 2000) ......................................... 2

*Krouse v. American Sterilizer Co.*, 126 F.3d 494 (3d Cir. 1997) ................................................ 16

Lassiter v. Children's Hosp. of Philadelphia, 131 F. Supp. 3d 331 (E.D. Pa. 2015) .............. 10, 18

*Maddox v. Univ of Tenn.*, 62 F.3d 843 (6th Cir. 1995) .................................................................. 8

*Mandel v. M & Q Packaging Corp.*, 706 F.3d 157 (3d Cir. 2013) ............................................... 22

*Mararri v. WCI Steel, Inc.*, 130 F.3d 1180 (6th Cir. 1997) ........................................................... 8

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) ............................................................................................................ 21

*McNemar v. Disney Store*, 91 F.3d 610 (3d Cir. 1996) ............................................................... 12

*Merit v. SEPTA*, 315 F. Supp. 2d 689 (E.D. Pa. 2004) ................................................................ 17

*Phillips v. Ctr. for Vision Loss*, 2017 U.S. Dist. LEXIS 30186 (M.D. Pa. Mar. 3, 2017) ............ 18

*Poper v. SCA Ams., Inc.*, 2012 U.S. Dist. LEXIS 113653 (E.D. Pa. 2012) .................................. 17

*Radue v. Kimberly—Clark Corp.*, 219 F.3d 612 (7th Cir. 2000) .................................................. 23

*Rodriguez v. AMTRAK*, 532 F. App'x 152 (3d Cir. 2013) ............................................................ 21

*Sadler v. Southwest Ala. Mental Health/Mental Retardation Bd.*, 1997 U.S. Dist. LEXIS 9695 (S.D. Ala. June 19, 1997) ..................................................................... 9

*Salley v. Circuit City Stores, Inc.,* 160 F.3d 977 (3d Cir. 1998) .................................................... 8

*Santiago v. Connecticut*, No. 06 Civ. 277, 2008 U.S. Dist. LEXIS 76026, 2008 WL 4453402 (D. Conn. Sept. 30, 2008) ......................................................... 24

*Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183 (3d Cir. 2003) ....................................... 16

*Skerski v. Time Warner Cable Co., a Div. of Time Warner Entm't Co., L.P.*, 257 F.3d 273 (3d Cir. 2001) ............................................................................................ 7, 13

*Slayton v. Sneaker Villa, Inc.*, 2017 U.S. Dist. LEXIS 39327 (E.D. Pa. 2017) ........................... 14

*Solomon v. Sch. Dist. of Philadelphia*, 532 F. App'x 154 (3d Cir. 2013) ................................... 13

*Tatum v. Hosp. of the Univ. of Pa.*, 57 F.Supp.2d 145 (E.D. Pa. 1999) ..................................... 15

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999) ................................................. 7, 15

*Thompson v. Kellogg's USA*, 619 F. App'x 141 (3d Cir. 2015) ................................................... 23

*United States v. Jackson*, 388 F. Supp. 3d 505 (E.D. Pa. 2019) .................................................. 19

*Walden v. Georgia Pacific Corp.*, 126 F.3d 506 (3d Cir. 1997) .................................................. 24

*Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751 (3d Cir. 2004) ............................... 15

*Yovtcheva v. City of Philadelphia Water Dep't*, 518 F. App'x 116 (3d Cir. 2013) ..................... 13

*Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847 (5th Cir. 1999) ....................................... 8

**Statutes**

21 U.S.C. § 802 ............................................................................................................................ 5

21 U.S.C. § 812(b)(1)(C) ............................................................................................................ 5

35 P.S. § 10231.102(3) ............................................................................................................... 19

35 P.S. § 10231.2103(b) ......................................................................................................... 6, 18

35 P.S. § 10231.303 .................................................................................................................... 19

35 P.S. § 10231.303(b)(6) ........................................................................................................... 20

35 P.S. § 10231.303(b)(7) ...................................................................................................... 19, 20

35 P.S. § 10231.304 .................................................................................................................... 19

35 P.S. § 10231.304(a) ................................................................................................................ 19

35 P.S. § 10231.304(b)(1) ........................................................................................................... 20

42 U.S.C. § 12111(8) ................................................................................... 7

42 U.S.C. § 12112(b)(5)(A) ......................................................................... 11

42 U.S.C. § 12210 ........................................................................................ 6

43 P.S. § 954(p.1) ........................................................................................ 6

43 P.S. § 954(p.1)(3) .................................................................................... 5

Phila. Code § 9-1128(1) ............................................................................... 2

**Other Authorities**

*EEOC, Enforcement Guidance: Reasonable Accommodation & Undue Hardship
    under the Americans with Disabilities Act* (Oct. 17, 2002) ..................... 10

**Regulations**

21 C.F.R. § 1308.11(d)(23).......................................................................... 5

29 CFR §1630.3 ........................................................................................... 8

Donna Hudnell's claims – for "disability" discrimination, for violation of the Medical Marijuana Act and for race discrimination – fail at every level. Hudnell was terminated after she tested positive for marijuana, in violation of Thomas Jefferson University Hospital's ("Jefferson") Drug and Alcohol policy ("D&A policy"), when she sought to return to work after being on a leave of absence for more than 90 days. While Hudnell had, at one time, been certified to use medical marijuana by the State – that certification was expired. And contrary to Hudnell's then-belief, "one time" certification from the State did not mean "lifetime" certification. While Jefferson routinely permits employees to use medical marijuana, its policy is that employees must be legally certified to use it and must "submit a copy of the [State certification] card" to support its use. Moreover, Hudnell admitted at the time of her Urinary Drug Screen ("UDS"), and during discovery, to using marijuana after her certification had expired. As such, Jefferson believed at the time, and the evidence subsequently bears out, that Hudnell violated Jefferson's policy by testing positive, not for *medical* marijuana – but for marijuana. There is no evidence to the contrary.

Hudnell principally asserts that Jefferson failed to provide her with a reasonable accommodation by failing to "advise [her] to see the doctor before administering the drug test." Third Am. Compl. ¶ 81. That is, Hudnell apparently argues that, although she had read Jefferson's D&A policy, knew she would be taking a drug test, knew her certification was expired, consented to the test and knew that she had used marijuana shortly before taking the test … it was Jefferson's fault that she tested positive.

Hudnell's claim that Jefferson terminated her in violation of the Medical Marijuana Act stretches credulity – as she asserts that Jefferson terminated her "solely on the basis of [her] status as an individual who *is* certified to use medical marijuana" – when the only evidence is

that she was terminated specifically because she was *not* certified to use medical marijuana at the time she tested positive in October 2019. Further, Hudnell's post-certification retention and use of marijuana violated the Act at every turn.

Finally, Hudnell has no evidence of race discrimination. Specifically, she has no evidence that a similarly situated white employee was told affirmatively to delay her test (as she believes she should have been) – nor does the observation by a non-decisionmaker nurse that she "appeared to be angry" during her UDS indicate racial bias on any level. Summary judgment should be granted to Jefferson in its entirety.

## I. HUDNELL'S CLAIM THAT SHE WAS DENIED A REASONABLE ACCOMMODATION UNDER THE PHRA AND PFPO FAILS AS A MATTER OF LAW[1]

Hudnell has a bad back (SUMF ¶5). She was first accommodated for this condition by Jefferson when she was permitted to work from home in May 2019 (*Id*). In July 2019, Hudnell requested, and was granted, extended FMLA leave (SUMF ¶10-11) because her back had gotten worse – to the point that she was completely unable to work (SUMF ¶9). When her FMLA expired on September 24, 2019, Jefferson provided Hudnell with the accommodation of a non-FMLA leave which was approved through October 31, 2019 (SUMF ¶13). Hudnell was

---

[1] Disability discrimination claims under the Pennsylvania Human Relations Act ("PHRA"), and the Philadelphia Fair Practices Ordinance ("PFPO") have been interpreted in a similar fashion. *See Ahern v. EResearch Tech., Inc*., 183 F. Supp. 3d 663, 668 (E.D. Pa. 2016); *Dici v. Commw. Pa.*, 91 F.3d 542, 552 (3d Cir. 1996) (the PHRA is applied in a similar manner as Title VII); *see also Joseph v. Cont'l Airlines, Inc.*, 126 F. Supp. 2d 373, 376 n.3 (E.D. Pa. 2000) (analysis of a claim under Title VII applies in equal force to the PFPO). "Under the PFPO, it is unlawful 'for an employer to fail to provide reasonable accommodations to an employee for needs related to pregnancy, childbirth, or a related medical condition, provided (i) the employee requests such accommodation and (ii) such accommodations will not cause an undue hardship to the employer.'" Phila. Code § 9-1128(1). Courts typically apply the same framework used for ADA failure to accommodate claims to PFPO claims." *Jones v. Children's Hosp. of Phila*., 2019 U.S. Dist. LEXIS 107347 (E.D. Pa. 2019). As such, all references to the PHRA apply with equal force to the PFPO.

scheduled for back surgery on November 4, 2019 (SUMF ¶14).  In early October, although her back *had not improved* and was still preventing her from working (SUMF ¶8-9) – and with surgery scheduled for the first week of November – Hudnell sought to return to work part-time (20 hours/week) from home for financial reasons.[2]

Hudnell was aware that Jefferson's Return to Work Clearance policy requires that for any employee attempting to return from a leave of more than 90 days "a criminal background check and drug testing is required." (SUMF ¶17).  As such, before speaking to her manager about if and how she could return to work, Hudnell made an appointment with the Jefferson Occupational Health Network ("JOHN") for Friday, October 11, 2019.  Knowing that her UDS would show opioids in her system, Hudnell made sure to obtain prescriptions for Oxycontin and Percocet on October 10 – which she presented at JOHN the next day (SUMF ¶21).  She also presented a Medical Marijuana Identification Card which had expired on August 25, 2019 – approximately 7 weeks earlier – and a copy of her note seeking part-time work from home. When the JOHN nurse (Barbara Symons) returned from copying the prescriptions, note and card, she stated to Hudnell that the card was expired to which Hudnell replied: "I know, [I've] got an appointment with Dr. Babula on Thursday [presumably October 17]" (Hudnell dep., 273:25). Hudnell was unbothered by the fact that her certification for medical marijuana had expired because "I didn't think it mattered" (*Id.*, 275:22).  That is, at the time, Hudnell believed "once you're certified for medical marijuana, you're certified" (SUMF ¶32)[3].  She now knows that

_____

[2] More specifically, Hudnell testified that as of early October, because the Jefferson-paid supplementary disability payments that bridged the gap between her normal salary and her Short Term Disability Benefits were exhausted, her "paycheck had went to half." (SUMF ¶16).

[3] As discussed more fully in relation to Hudnell's MMA claim, according to the Pennsylvania Department of Health's website and electronic communications, there are multiple steps required to be re-certified (annually) to use medical marijuana.  Hudnell admits that, while it is important to read "all the instructions … apparently … [she] did not." (Hudnell dep., 233:25).

certification at some point "doesn't mean lifetime certification" ("Yeah. I know now") (Hudnell dep., 276:11-12). Notably, although Hudnell's Third Amended Complaint alleges that she requested the reasonable accommodation of "postponing her drug test" (Third Am. Compl. ¶107), not only is there no evidence to support this allegation, Hudnell testified that she did not want to delay her test until after her appointment with Dr. Babula "because [she] had to return to work right away in order to get a full paycheck for the next pay." Hudnell dep., 275:17.[4]

After consenting in writing to the UDS (SUMF ¶36), Hudnell tested "non-negative" for opioids and THC (the metabolite compound in marijuana) at JOHN (SUMF ¶37). An independent laboratory subsequently confirmed the presence of THC in Hudnell's urine (SUMF ¶43). Ellen O'Connor, M.D., the Medical Director of JOHN, then called Hudnell to review the test results, during which call Dr. O'Connor confirmed that Hudnell's certification to use marijuana had expired (SUMF ¶45). Hudnell was "upset that her doctor didn't tell her about this [sic] policy." (*Id.*). Hudnell also told Dr. O'Connor that it "should be [Dr. O'Connor's] obligation to educate HR re: marijuana staying in a person's system." *Id.*[5] Hudnell was not surprised by the positive test. (Hudnell dep., 290:7) ("why would I be surprised if I'm certified to smoke marijuana [sic]"). Hudnell also confirmed to Dr. O'Connor that she may have leftover marijuana from the past (O'Connor dep., 100:10).[6]

---

[4] Note that Hudnell testified that she did not receive her *re*-certification card from the State until some time after October 28, 2019 – meaning that had the test been delayed until she was able to present a valid and up-to-date card – she would have *not have needed to return to work* since she was scheduled for surgery on November 3, 2019.

[5] Hudnell testified that she has no medical basis to opine on how long the marijuana metabolite stays in a person's system after use (Hudnell dep., 49:5).

[6] Hudnell testified that she doesn't remember the conversation with Dr. O'Connor other than "all I heard was, yeah, the test came back positive or something." (Hudnell dep., 291:13). As such, Dr. O'Connor's testimony as to the conversation stands unrebutted.

While the Third Amended Complaint alleges that "Hudnell requested reasonable accommodations for her disabilities, including but not limited to, postponing her drug test, waiving her drug test, or permitting her to use an alternative medication," there is no *evidence* that she requested any accommodation related to her positive drug test. To the contrary, Hudnell consented to the UDS and, in her mind, she believed "once you're certified for medical marijuana, you're certified."

But, as even Hudnell now admits, one-time certification to use medical marijuana is not lifetime certification. Accordingly, to the extent Hudnell seeks an accommodation associated with her positive drug test on October 11, 2019, she is seeking an accommodation for testing positive for an illegal substance as defined by the D&A policy and by the Pennsylvania Human Relations Act ("PHRA"). That is, without a valid and current certification to use marijuana, Hudnell's use of the same violated Jefferson policy and was illegal. The PHRA's definition of the term "handicap or disability" specifically excludes "current, illegal use of or addiction to a controlled substance, as defined in section 102 of the Controlled Substances Act [("CSA")] (Public Law 91-513, 21 U.S.C. § 802)." 43 P.S. § 954(p.1)(3). In turn, the CSA lists marijuana as a Schedule I controlled substance, meaning, in part, that "[t]here is a lack of accepted safety for use of the drug or other substance under medical supervision." 21 U.S.C. § 812(b)(1)(C); 21 C.F.R. § 1308.11(d)(23) (Schedule I's listing of marijuana). As such, any claim that Jefferson should have accommodated Hudnell's *illegal* drug use fails under the plain language of the PHRA.[7]

---

[7] Moreover, even if Hudnell had been certified to use marijuana on October 11 (which she was not), as this Court recognized in ruling on Jefferson's Motion to Dismiss the Third Amended Complaint, in *HACC*, "the Commonwealth Court held that a community college was not required to accommodate medical marijuana use under the PHRA]." *Hudnell v. Thomas Jefferson Univ. Hosps., Inc.*, 2021 U.S. Dist. LEXIS 2610, *5 (E.D. Pa. 2021). Expanding the

Given the explicit language of the ADA and PHRA excluding illegal drug use from coverage, the lack of case discussion, much less precedent, regarding the self-evident proposition that an employer is not required to accommodate an employee's illegal drug use is not surprising. Specifically, the ADA's exclusion of "illegal drug users from the term 'individual with a disability' when 'the covered entity acts on the basis of such use,' and defines 'illegal use of drugs' as the 'use of drugs which is unlawful under the [CSA.]'" *Harrisburg Area Cmty. Coll. v. Pa. Human Rels. Comm'n*, 245 A.3d 283, 293, note 10, 2020 Pa. Commw. LEXIS 722, *20 (Pa. Cmwlth. 2020) (citing 42 U.S.C. § 12210) ("*HACC*").  Notably the *HACC* court found that the "PHRA uses different language, but accomplishes similar ends. *See* 43 P.S. § 954(p.1) (excluding 'current, illegal use of or addiction to a controlled substance' from the definition of 'handicap or disability')".

A.    **Hudnell's positive UDS rendered her not "otherwise qualified" for employment**

To the extent that the Court advances its analysis regarding whatever additional or alternate reasonable accommodation Hudnell claims to have requested in relation to her UDS or as it relates to her request for part-time, at-home work (as per her pain management physician's note), there are multiple bases upon which the Court can alternatively find that Hudnell was not entitled to an additional accommodation as a matter of law.

Initially, as this Court found in *Hudnell*, *supra.* "[t]o state a claim for discrimination under the PHRA, Hudnell must show: (1) she is disabled within the meaning of the PHRA; (2)

---

argument slightly, in *HACC,* the Commonwealth Court applied the PHRA in conjunction with the MMA and found that "while the [Act] provides that employees cannot be discriminated against due to their status as certified users of medical marijuana, *[it] does not require that an employer provide an accommodation therefor*."  *HACC* at *13 (citing 35 P.S. § 10231.2103(b) ("MMA")) (emphasis added).

she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) she suffered an adverse employment decision as a result of the discrimination." (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)). While Hudnell's back condition qualifies as a "disability" and her termination is an "adverse employment decision," Hudnell's positive test for illegal drugs rendered her not "otherwise qualified" for continued employment at Jefferson.

In *Fischer v. Pepper Hamilton LLP*, 2016 U.S. Dist. LEXIS 10603, *29 (E.D. Pa. 2016) (Pappert, J.), this court observed that a "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). "To satisfy this requirement, a plaintiff must first demonstrate that [he] 'satisfies the requisite skill, experience, education and *other job-related requirements of the employment position that such individual holds or desires*.'" (citing *Skerski v. Time Warner Cable Co., a Div. of Time Warner Entm't Co., L.P.*, 257 F.3d 273, 278 (3d Cir. 2001)) (emphasis added).

In this matter, Jefferson's D&A policy defines a "prohibited drug" to include "any drug made illegal as a matter of federal … law, which … is legally obtainable but has not been legally obtained *or used*." Further, the policy provides that "any individual … who has a positive drug screen will be subject to disciplinary action, up to and including termination of employment or affiliation." (SUMF ¶40).

In the precedential decision of *Copeland v. Philadelphia Police Dept.*, 840 F.2d 1139, 1149 (3d Cir. 1988), the Third Circuit affirmed summary judgment to a police department where an officer had been terminated for use of illegal drugs finding, in relevant part that "because a police department is justified in concluding that it cannot properly accommodate a user of illegal

drugs within its ranks, we conclude that Copeland is not otherwise qualified for the position and thus does not qualify for the protections afforded by the [Rehabilitation] Act."[8] *See also Zenor v. El Paso Healthcare Sys., Ltd*., 176 F.3d 847, 853 (5th Cir. 1999) ("due to Zenor's cocaine use, he was not otherwise qualified for the job of a pharmacist.").

In the instant matter, it is undisputed that HR Business Partner Erik Johnson made the decision to terminate Hudnell's employment because "she violated the drug and alcohol policy. And the outcome of [the] policy is if you violate it, the decision was made to terminate her for violation of the drug and alcohol policy." (Johnson dep., 113:9). As such, Hudnell's violation of Jefferson's policy rendered her "not otherwise qualified" for her position (or for continued employment) and the Court's inquiry in this regard can, and should, stop with judgment entered in Jefferson's favor.[9] *See Salley v. Circuit City Stores, Inc.*, 160 F.3d 977, 980 n.2 (3d Cir. 1998) ("[T]he ADA ensures that current use, even if it is a natural consequence of an addiction disability, may be grounds for termination under the ADA."); *Mararri v. WCI Steel, Inc.*, 130 F.3d 1180, 1182 (6th Cir. 1997) (citing *Maddox v. Univ of Tenn*., 62 F.3d 843 (6th Cir. 1995)) (finding it appropriate to distinguish between a discharge on the basis of misconduct and a discharge on the basis of a disability, such as alcoholism).

---

[8] Note that the regulations to the ADA provide that "the terms disability and qualified individual with a disability do not include individuals currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 29 CFR §1630.3.

[9] Alternatively, Jefferson's D&A policy makes clear that compliance with the same is an "essential function" of employment. Disregard of the policy would qualify as "elimination" of an essential function of employment which, of course, is not required as a matter of law. *Donahue v. CONRAIL*, 224 F.3d 226, 232 (3d Cir. 2000) ("employers are not required to modify the essential functions of a job in order to accommodate an employee").

**B.      Hudnell's post-test request for leniency is not a reasonable accommodation**

Finally (as it relates to Hudnell's violation of the D&A policy), any after-the-fact request to disregard or make an exception to the termination provision of the policy does not, as a matter of law and logic, constitute a "reasonable accommodation" that would have enabled Hudnell to perform the essential functions of her position.  That is, individuals are entitled to reasonable accommodations that will allow them to perform the duties of the position sought or held.  As observed by the court in *Sadler v. Southwest Ala. Mental Health/Mental Retardation Bd.*, 1997 U.S. Dist. LEXIS 9695, *13-14 (S.D. Ala. June 19, 1997), the reasonable accommodation requirement "relates to an individual's ability to perform [his/her] job."  Like in *Sadler*, Jefferson does not dispute that Hudnell was basically capable of performing the duties of her Systems Analyst position without marijuana (which, according to her testimony, she took to sleep at night).  Hudnell's request for Jefferson to disregard or waive its policy against illegal drug use, therefore, was not related to her ability to perform the essential functions of her position.  Rather, it affected only her "ability to remain employed, not [her] ability to perform the essential functions of [her] position." *See also Bey v. Wash. Metro. Area Transit Auth.,* 341 F. Supp. 3d 1, 18 (D.D.C. 2018) (court granted summary judgment to employer where employee sought a waiver of the requirement to report the use of a controlled substance following a last chance agreement.  "A waiver of the prescription drug reporting requirement merely to avoid potential suspension or termination for noncompliance … is not related to the limitation that rendered him disabled [and would not be a reasonable accommodation].").

Moreover, to the extent that Hudnell claims that she requested some sort of accommodation during the post-termination grievance process (which, more accurately took the form of complaining "why didn't someone tell me that taking marijuana without a valid certification to do so would result in a 'positive' UDS result?"), such "requests" are "too little

too late."  Specifically, in Lassiter v. Children's Hosp. of Philadelphia, 131 F. Supp. 3d 331, 351 (E.D. Pa. 2015), the court found that "[t]he ADA does not mandate that an employer excuse an employee's previous misconduct, even if it was precipitated by his or her disability." ("When an employee requests an accommodation only after it becomes clear that an adverse employment action is imminent, such a request can be too little, too late.") (citing Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 90 (1st Cir. 2012)).  *See also EEOC, Enforcement Guidance: Reasonable Accommodation & Undue Hardship under the Americans with Disabilities Act* (Oct. 17, 2002) ("An employer never has to excuse a violation of a uniformly applied conduct rule that is job-related and consistent with business necessity.  [A]n employer may discipline an employee with a disability for engaging in such misconduct if it would impose the same discipline on an employee without a disability").

C.     **Hudnell's "request" for part-time work fails at every turn**

In addition to whatever Hudnell wanted Jefferson to do to accommodate her positive UDS, she also presented to JOHN a note to have Jefferson's accommodation of a leave of absence modified to allow her to work part-time (20 hours/week) from home for an unspecified period (SUMF ¶23).  This request, such as it was, was a shell game on Hudnell's part since she testified that her back rendered her *incapable of working* in October 2019 – when she ostensibly sought to return to work part-time (SUMF ¶8-9).  It is also important that Hudnell's motivation to work was not her improved physical condition or any belief that she was capable of working (since she admits she was not) – but rather her own financial situation due to the cessation of the Jefferson-funded supplemental disability benefits.  (SUMF ¶16). Further, as discussed above, Hudnell's positive UDS, in violation of Jefferson's D&A policy, made her not "otherwise qualified" for an accommodation as a matter of law.  Finally, Hudnell's refusal to clarify her

return-to-work note in order to provide Jefferson with critical information to consider her possible return caused the interactive process to break down.

Initially, to establish a failure-to-accommodate case, a plaintiff must establish that: "(1) [she] was disabled and [her] employer knew it; (2) [she] requested an accommodation or assistance; (3) [her] employer did not make a good faith effort to assist; and (4) [she] could have been reasonably accommodated." *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quoting *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)). As this Court observed in *Fisher*, *supra.*, "[t]o survive summary judgment on an ADA failure to accommodate claim, a plaintiff must establish that the employer failed to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].'" 42 U.S.C. § 12112(b)(5)(A); *see also Garner v. Sch. Dist. of Phila.*, 63 F. Supp. 3d 483, 489 (E.D. Pa. 2014 (granting summary judgment dismissing plaintiff's failure to accommodate claim).

### D. Hudnell's request for part-time work was a sham

As discussed above, Hudnell's positive drug test violated Jefferson's D&A policy and rendered her not "otherwise qualified" for any accommodation. But more fundamentally, Hudnell's unequivocal testimony that the back condition that rendered her unable to work from July to October (requiring her to take FMLA and then a non-FMLA leave of absence) did not improve from October to January (until she underwent surgery) establishes that she was not otherwise qualified for her position because, *by her own admission*, she simply could not work. Hudnell's testimony leaves her with the "rock and the hard place" choice of admitting that her FMLA leave was taken under false pretenses (*i.e.*, she could have worked from July to the

beginning of October) or, because her back did not improve during this period, she was unable to work in any capacity at the time she "sought" to return. (Hudnell dep., 154:12) ("I was already incapacitated [but my accident in July 2019] just made it worse."); (*id*. at 155:20) (Q: "… and so if in July 2019 your back was so bad that you couldn't even work, it never got any better until … you had surgery [in January 2020], right? A: correct"); *id*. at 162:12 (Q: "So you weren't able to work from October until January either, right? A: October until January, yeah, three months."). Both positions cannot be true.[10]

Hudnell's game playing, as evidenced by her testimony – namely asserting that she was "incapacitated" and unable to work while at the same time claiming that Jefferson should have permitted her to work part-time – cannot be countenanced by this Court. "Nothing grants a person the authority to flout the exalted status that the law accords statements made under oath or penalty of perjury. Nothing permits one to undermine the integrity of the judicial system by playing fast and loose with the courts by asserting inconsistent positions." *McNemar v. Disney Store*, 91 F.3d 610, 620 (3d Cir. 1996).[11]

### E.   Jefferson provided Hudnell the accommodation of an extended leave of absence

Further, even if the Court finds Hudnell to have been "otherwise qualified" to perform the essential functions of her job in October 2019 (and it should not), Jefferson was already providing her with the accommodation of a non-FMLA leave of absence. While "an employer

---

[10] Nor should Hudnell be permitted to argue that she was only requesting to "try" to work temporarily – while refusing to provide Jefferson with an end date to the trial period. Again, Hudnell cannot have it both ways.

[11] Moreover, although Hudnell does not know the difference between the types of disability benefits she received, she knows that she received a succession of short-term disability, long-term disability and then Social Security disability benefits from July 2019 through Spring 2021 – further demonstrating her knowledge that she was unable to perform the duties of her position

has a duty to offer a reasonable accommodation to a qualified employee, 'an employee cannot make [the] employer provide a specific accommodation if another reasonable accommodation is instead provided.'" *Solomon v. Sch. Dist. of Philadelphia*, 532 F. App'x 154, 158 (3d Cir. 2013) (non-precedential) (citations omitted); *see also Yovtcheva v. City of Philadelphia Water Dep't*, 518 F. App'x 116, 122 (3d Cir. 2013) (non-precedential) ("[A]n employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation."). Inasmuch as "a leave of absence is a reasonable accommodation under the ADA" (*Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 151 (3d Cir. 2004)), it is Hudnell's burden to establish that the leave provided was not a reasonable accommodation as a matter of law. *See Buskirk v. Apollo Metals*, 307 F.3d 160, 171 (3d Cir. 2002) (recognizing that reasonableness is typically a fact question but concluding that no reasonable jury could have found a lack of reasonable accommodations). Given Hudnell's testimony that she was physically incapable of working at the time she "sought" to return, Jefferson's extended leave of absence was a reasonable accommodation and nothing more was required.

## F. Conversion of a full-time position to part-time position is not a reasonable accommodation

Even if Hudnell advances this far in her claim that Jefferson failed to provide her a reasonable accommodation (and she cannot), she has even more insurmountable hurdles regarding her claim as it relates to Jefferson's alleged denial of part-time work, inasmuch as the "request," such as it was, would have required Jefferson to convert the Systems Analyst position from full-time to part-time. Hudnell testified that her position was "full-time." (SUMF ¶2). Further, Jefferson does not employ any part-time System Analysts (SUMF ¶3). In accordance with *Skerski*, *supra.,* it is Hudnell's burden both identify an accommodation and establish its

reasonableness.  257 F.3d 273, 284 (3d Cir. 2001); *see also Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580-81 (3d Cir. 1998).  "Even if an employee requests an accommodation and the employer refuses to engage in the interactive process, a *prima facie* case is not made out unless the employee also submits evidence establishing that she could have been reasonably accommodated."  *Slayton v. Sneaker Villa, Inc.*, 2017 U.S. Dist. LEXIS 39327, *30 (E.D. Pa. 2017).  Hudnell has no evidence in this regard.[12]

### G.        Hudnell was responsible for the breakdown in the interactive process

Hudnell's claim that Jefferson failed to engage in the interactive process also fails.  The only evidence is that Jefferson, and particularly the JOHN nurse Barbara Symons, attempted to initiate the interactive process as to the length of time Hudnell would need "part-time" work – and that Hudnell refused to provide the information requested.  While a *temporary* part-time position could be a reasonable accommodation, it is undisputed that the note presented by Hudnell (SUMF ¶23) did not specify a potential end date for converting her full-time position to one working only part-time.  Symons initiated the interactive process by requesting that Hudnell return to her physician to clarify an anticipated "end date" for the proposed accommodation ("I explained to her that until there is an end date the accommodation wouldn't be approved.  I told her she might as well work on getting the note clarified.  Otherwise it's just going to prolong the approval process." Symons dep., 36:23 – 37:4) (See also contemporaneous notes – "No end date on note.  She will not contact office because there is a fee for all notes.  She said it is until she has surgery.  No surgical date scheduled …") (SUMF ¶30).  Hudnell, as noted, told Symons that

---

[12] Moreover, if Hudnell claims that she only needed part-time work for a limited period, then it was her obligation to provide such information to Jefferson.  As discussed *infra*, her refusal to do so resulted in a breakdown of the interactive process.

she *would not* "reach out" to her physician because "they were going to charge her for a new note" (Symons dep., 36:17).

The law regarding the search for a reasonable accommodation is well-settled. "Once a qualified individual with a disability has requested...a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with the disability." *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004). It is equally well-settled that "an employer cannot be faulted if the employee's actions or omissions during the interactive process cause the process's failure." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 507 (3d Cir. 2010). In particular, "an employer cannot be faulted if after conferring with the employee to find possible accommodations, *the employee then fails to supply information that the employer needs or does not answer the employer's request for more detailed proposals*." *Taylor*, 184 F.3d at 317 (emphasis added).

The instant matter is similar to *Tatum v. Hosp. of the Univ. of Pa.*, 57 F.Supp.2d 145, 149 (E.D. Pa. 1999), in which the court found that after the plaintiff presented "an insufficient note" supporting her requested accommodation, the hospital requested that the plaintiff get a more detailed letter from her physician. The plaintiff refused. When the plaintiff subsequently claimed that she had been denied a reasonable accommodation, the court granted summary judgment to the hospital, finding that "plaintiff did not provide the necessary medical information. Thus, the Hospital could not proceed further in the interactive process. Plaintiff has not shown that prior to the termination of her employment, the Hospital foreclosed any

further discussion as to her disability, or otherwise refused to consider any further proof of her need for a reasonable accommodation."

Here, Symons did all she could do on behalf of Jefferson by asking Hudnell to have her physician provide the information necessary for Jefferson to understand/consider her request for a part-time position. Hudnell stopped the process "cold" and no further inquiry was necessary regarding possible part-time work after she tested positive for prohibited drugs. Jefferson took the first step in the interactive process regarding possible part-time employment and nothing more could have been expected or required. Summary judgment is in order.

### H.    Hudnell has no evidence that she was retaliated against for requesting a "reasonable accommodation"

Hudnell's claim that she was retaliated against for requesting a "reasonable accommodation" fares no better. "To show a *prima facie* case of ADA discrimination or retaliation, [a plaintiff] must provide evidence of (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Belles v. Wilkes-Barre Area Sch. Dist.*, 843 F. App'x 437, 439 (3d Cir. 2021), *citing Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

Although the precise contours of Hudnell's retaliation claim are unclear, it appears that her claim is one that the reason offered by Jefferson for her termination – that she tested positive for a prohibited drug in violation of its D&A policy – is pretextual and that the real reason was that she requested to work part-time from home (or whatever it is that she now claims she sought as an accommodation in relation to her UDS). "A 'pretext' claim of illegal retaliation follows the familiar burden shifting analysis . . . set forth in *McDonnell Douglas* . . . ." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003). It is always the plaintiff's burden to

prove that retaliatory animus played a role in the employer's decision-making process and that it had a determinative effect on the outcome of the process. *Krouse*, *supra*.

Hudnell cannot establish the requisite "causal connection" between her request to work part-time from home and her termination. Specifically, since Hudnell (a) tested positive for prohibited drugs and (b) refused to provide information necessary to Jefferson's consideration of her part-time request, she has no evidence that her *request* to work part-time was even considered by Johnson, the decisionmaker. Rather, the only evidence is that Johnson made the termination decision based upon Hudnell's positive drug test. *See Merit v. SEPTA*, 315 F. Supp. 2d 689, 709 (E.D. Pa. 2004) (summary judgment to the employer where court found, in part "there is nothing in the record to suggest that [human resources] told [the decisionmaker] about [the plaintiff's] request for accommodation."); *Poper v. SCA Ams., Inc.*, 2012 U.S. Dist. LEXIS 113653, *30 (E.D. Pa. 2012) (court granted summary judgment where the plaintiff failed to produce evidence that he had requested an accommodation for his alleged disability). Moreover, Symons testified that because her role is only to forward information to the appropriate parties – and Hudnell was refusing to provide updated information regarding her return request, she did not advance Hudnell's request (Symons dep., 38:4).

Since there is no meaningful evidence that Hudnell requested any accommodation (reasonable or otherwise) as it relates to her UDS itself, her (presumed) retaliation claim could only be that Jefferson terminated her employment because she wanted Jefferson to disregard or make an exception to the termination provision of the policy *after she tested positive*. To state this "claim" is to recognize its absurdity. While Hudnell will undoubtedly claim that while at JOHN she told Symons that she had an appointment with her physician the following week, she (a) never requested that the UDS be postponed (and since she believed that her expired

certification was somehow still viable – logically, postponement would have been unnecessary – *i.e.*, "it didn't matter") and (b) then provided written consent to the UDS and (c) then provided a urine sample.  Rather, to the extent that Hudnell ever requested any sort of accommodation for her positive drug test, it would have occurred after the result was received and determined to be "positive."  This cannot establish the causal connection necessary as a matter of law.  *Lassiter*, *supra.* ("When an employee requests an accommodation only after it becomes clear that an adverse employment action is imminent, such a request can be too little, too late.  The ADA does not mandate that an employer excuse an employee's previous misconduct, even if it was precipitated by his or her disability.") (citing *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 90 (1st Cir. 2012); *Phillips v. Ctr. for Vision Loss*, 2017 U.S. Dist. LEXIS 30186 (M.D. Pa. Mar. 3, 2017) (noting that plaintiff's request for accommodation "was not sent until after Yingling decided to terminate Plaintiff for her poor work performance and attitude . . . This prospective accommodation request does not excuse Plaintiffs past misconduct.").  Summary judgment is therefore in order for Hudnell's PHRA disability-retaliation claim.

## II.  HUDNELL'S EXPIRED CERTIFICATION REMOVES HER FROM THE PROTECTION OF THE MEDICAL MARIJUANA ACT

Hudnell's claim that she was discriminatorily terminated in violation of the MMA can be easily and summarily addressed.[13]

The MMA only prohibits discrimination against an employee where the action in question is taken "solely on the basis of such employee's status as an individual who *is certified* to use medical marijuana."  MMA § 2103(b)(1) (emphasis added).  The Act requires that "[a]

---

[13] Jefferson does not waive its argument that the MMA does not provide individuals with a private right of action – but will not reiterate its arguments in this regard, as set forth in its 12(b)(6) Motion.

patient . . . *shall possess* an identification card whenever the patient . . . is in possession of medical marijuana." MMA § 303(b)(7) (emphasis added). Any other use of marijuana remains unlawful. MMA § 304(a) ("Except as provided in [the MMA], the use of medical marijuana is unlawful."). "The MMA provides a very limited and controlled vehicle for the legal use of medical marijuana by persons qualified under the MMA. Outside the MMA, marijuana remains a prohibited Schedule I controlled substance for the general citizenry who are unqualified under the MMA." *Commonwealth v. Jezzi*, 208 A.3d 1105, 1115 (Pa. Super. 2019) (citing MMA §§ 102(3) & 304); *see also Commonwealth v. Handley*, 213 A.3d 1030, 1040-41 (Pa. Super. 2019) (rejecting the proposition that the MMA's passage renders unconstitutional marijuana's inclusion in Schedule I of the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act); *Commonwealth v. Waddell*, 61 A.3d 196, 198 (Pa. Super. 2012) (rejecting the argument that marijuana no longer qualifies as a Schedule I substance because of its demonstrated medicinal value).

It is clear (as well as self-evident) therefore, that a valid medical marijuana card is a prerequisite in order to access the rights provided by the MMA, including those rights enumerated in § 2103. *Gass v. 52nd Judicial Dist., No. 118 MM* 2019, 236 A.3d 706 (Pa. June 18, 2020) ("to the degree that they satisfy the Act's threshold requirements and obtain medical marijuana cards, each [individual] is entitled to the immunity afforded under Section 2103(a)"); *United States v. Jackson*, 388 F. Supp. 3d 505, 508-09 (E.D. Pa. 2019) (quoting MMA § 303) ("The Act also requires a 'patient' . . . to be 'in possession of a valid identification card issued by' the Pennsylvania Department of Health at any time they are in possession of medical marijuana.").

Here, Plaintiff admits that she did not possess a valid MMA identification card at the time of her positive drug test. Any argument that she may make that her certification from August 25, 2018 to August 25, 2019 somehow brought her under the protection of the MMA on October 11, 2019 is undermined by her own testimony that she *now* understands that "certification does not mean lifetime certification."

If this point needs any further emphasis, the anti-discrimination language of the MMA is in the present tense – prohibiting discrimination against an "individual who *is certified* to use medical marijuana." Any argument that Hudnell's expired certification or her future appointment to meet with a physician to determine whether she should be re-certified made her *presently* certified, is absurd.

Moreover, the only evidence is that Jefferson's sole basis for determining that Hudnell had tested "positive" for the use of prohibited drugs (and had therefore violated its D&A policy) was that she was *not* in possession of a valid and up-to-date card certifying her use of marijuana for medicinal purposes at the time of the UDS. This is, of course, the exact opposite of the protection offered by the MMA.[14]

---

[14] Moreover, Hudnell's admitted handling of, possession of and use of marijuana both before and after August 25, 2019 was outside the protection of the MMA – rendering the same illegal (in addition to being "prohibited" under the D&A policy). Specifically, the MMA provides that the "lawful use of medical marijuana is subject to:

(6) Medical marijuana that has not been used by the patient shall be kept in the original package in which it was dispensed (MMA § 303(b)(6)) (Q: did you keep the marijuana in [its original jar]? A: No. I have … my personal jar that I put it in – Hudnell dep., 312:16);

(7) A patient … shall possess an identification card whenever the patient … is in possession of medical marijuana. (MMA § 303(b)(7)).

Further, the MMA explicitly deems it unlawful to "smoke medical marijuana" (MMA § 304(b)(1) (Q: You said that … you used to smoke your marijuana, right? A: correct) (Hudnell dep., 184:3).

## III.    HUDNELL HAS NO EVIDENCE THAT RACE PLAYED A ROLE IN HER TERMINATION

Amid the "slim pickings" of her Third Amended Complaint, Hudnell's final claim, for race discrimination in violation of Title VII, Section 1981 and the PHRA/PFPO, barely registers. The entirety of her "evidence" of racial animus can be summarized in the deposition exchange:

> Q: If the Hospital's records show that there are at least … 50 individuals working … who the hospital is permitting to use medical marijuana … do you have any explanation, any thought as to why you believe you were discriminated against for the use of medical marijuana …?
>
> A: Are they black or white?
>
> ***
>
> Q: Is that your answer?
>
> A: Yes

(Hudnell dep., 340-341).  "A plaintiff's subjective belief that race played a role in an employment decision is not sufficient to establish an inference of discrimination." *Rodriguez v. AMTRAK*, 532 F. App'x 152, 153 (3d Cir. 2013).

"Claims of discrimination in violation of Title VII are analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  First, the plaintiff must establish a *prima facie* case of discrimination. To do so, a plaintiff must demonstrate that [she] (1) was a member of a protected class, (2) was qualified for the position, (3) suffered an adverse employment action, and (4) the circumstances of the adverse employment action imply discrimination."  *Peake v. Pa. State Police,* 644 F. App'x 148, 151 (3d Cir. 2011), citing *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).  In the instant matter, Hudnell fails to present evidence of the second and fourth elements.  Specifically, while she is a member of a protected class and was terminated, she was not "qualified" for employment following her positive drug test (as discussed extensively above).

Moreover, Hudnell has no evidence that the circumstances of her termination "imply discrimination" on any level.

As discussed above, Hudnell's positive drug test, in violation of Jefferson's D&A policy, meant that she was not "qualified" for employment after October 15, 2019 (the date on which her non-negative test was confirmed to be "positive"). *See Detz v. Greiner Industries, Inc*., 346 F.3d 109, 119 (3d Cir. 2003) (to be qualified under the *McDonnell Douglas* analysis a plaintiff must have been "performing his job at a level that met his employer's legitimate expectations at the time of his discharge."); *Hairston v. Runyon*, 1997 U.S. Dist. LEXIS 19782, *7-8 (E.D. Pa. 1997) ("[b]y violating a legitimate USPS policy (to refrain from heated verbal exchanges), Hairston has failed to show he was qualified for the 204B supervisory position, and failed to satisfy the second requirement of his *prima facie* case"). Jefferson has made clear that it expects its employees to successfully pass a drug test when administered in accordance with its policies (or to be in possession of a valid certification card when using marijuana for medicinal purposes). Hudnell's failure to meet this legitimate expectation rendered her "not qualified" and therefore unable to establish a *prima facie* case of race discrimination as a matter of law.

Even if the Court finds that Hudnell was "qualified" for continued employment despite her positive drug test, she has no evidence that her race played any role in the termination decision. As the *Peake* court observed "an unlawful inference of discrimination can be shown by identifying a similarly situated individual, outside of the protected class, who engaged in the same conduct and was treated more favorably." (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013)). "A plaintiff claiming that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason . . . must show that he is similarly situated with respect to performance, qualifications, and conduct, which

normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Thompson v. Kellogg's USA*, 619 F. App'x 141, 146 (3d Cir. 2015), *citing Radue v. Kimberly—Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000).

In the instant matter, Hudnell has no evidence that any other employee who tested positive for marijuana without a valid and up-to-date certification for the same was *not* terminated by Johnson or in consultation with Josh Elton (Johnson's supervisor).[15]  The only evidence is that employees who use "prohibited drugs" as defined by the D&A policy and who do not have a prescription or certification for the drugs used are terminated.  Hudnell has no evidence of the race of any individual who tested "positive" in violation of the D&A policy and, as such, cannot establish disparate treatment with any comparison.

It is also possible that Hudnell will seek to establish a causal connection between her race and her termination by referring to Symon's notes of her conversation with Hudnell in which, in addition to observations that Hudnell appeared to be "in pain, facial expressions and movements" she also observed that Hudnell "appears very angry during our time in the exam room."  First, Symons testified that as a nurse, observations regarding an individual are part of her "objective finding" ("If somebody is crying, I will put that they are crying … it's what I see") (Symons dep., 56:12).  Further, while the Third Circuit Court of Appeals has recognized that comments such as "all of you" and "that one in there" may be "code words" for discriminatory animus (*see*

---

[15] To the extent that Hudnell posits that the treatment of former employee James Lott (white) evidences discrimination – such may be easily rejected.  Primarily, no discovery was taken regarding Lott.  To the extent that Hudnell raises any argument regarding Lott, Jefferson reserves the opportunity to demonstrate why Lott is not a valid comparator to Hudnell for the purpose of establishing a *prima facie* case of race discrimination.

*e.g. Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1081 (3d Cir. 1996)), these are

consistently in the context of harassment claims. Rather, there does not appear to be any

precedent for a court to find "code" or "dog whistle" words as evidence of racial animus without

additional evidence that race played a role in the decision at issue. Courts decline to recognize

allegations of "code words" when the specific words at issue activate no racial implications or

animus. *See Humphries v. City Univ. of New York*, No. 13 Civ. 2641, 2013 U.S. Dist. LEXIS

169086 (S.D.N.Y. Nov. 26, 2013); *Allen v. Bake-Line Prods., Inc*., No. 98 Civ. 1119, 2001 U.S.

Dist. LEXIS 17103, (N.D. 111. Oct. 17, 2001) (plaintiff's allegations of being called "stupid"

"lazy," "motherf***," and "bitch" do not establish racial animus); *Santiago v. Connecticut*, No.

06 Civ. 277, 2008 U.S. Dist. LEXIS 76026, 2008 WL 4453402, at *6 (D. Conn. Sept. 30, 2008)

("Plaintiff contends that evidence of discrimination may be found in 'code words' his

supervisors used about him, including 'violent,' 'PTSD,' 'loose cannon' and 'intimidating.'

These 'code words' provide an insufficient basis for a reasonable inference that the incidents

were motivated by discriminatory intent"). Moreover, the *Aman* court found that code words are

"only relevant for what they reveal – the intent of the speaker." 85 F.3d at 1083. In the instant

matter, Symons' observation of Hudnell as appearing "angry" reveals nothing about *Johnson*'s

motivation in terminating Hudnell's employment. Symons was not involved in the termination

decision. As such, her observation (even if it reveals discriminatory animus – which it does not)

is little more than a stray remark by a non-decisionmaker. "Comments by those individuals

outside of the decisionmaking chain are stray remarks, which, standing along, are inadequate to

support an inference of discrimination." *Burrows v. Twp. of Logan*, 415 F. App'x 379, 383 (3d

Cir. 2011) (quoting *Walden v. Georgia Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997)).

## IV.     CONCLUSION

Hudnell's claims are little more than an exercise in blame-shifting and wishful thinking. She admits that she knows *now* that one-time certification to use marijuana is not a lifetime certification … but, despite admitting that she would have known this *had she read the second sentence of an email* from the Pennsylvania Department of Health, she blames Jefferson for applying its D&A policy against using prohibited drugs without a valid prescription or certification.  "You should have saved me from myself" is not a viable legal theory on any level. Once this fundamental truth is in place, as it must be from Hudnell's own testimony, her house of cards tumbles and summary judgment to Jefferson is in order.

**FISHERBROYLES, LLP**

Dated:  July 7, 2021                    By:   */s/ Sidney R. Steinberg*
                                              Sidney R. Steinberg
                                              sidney.steinberg@fisherbroyles.com
                                              333 E. Lancaster Ave. #321
                                              Wynnewood, Pa. 19096
                                              610-806-5060

                                              David E. Renner
                                              david.renner@fisherbroyles.com
                                              5990 University Boulevard, Box 148
                                              Moon Township, PA 15108
                                              412-746-1720

                                              *Counsel to Defendant*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I filed on this date a true and correct copy of the foregoing Motion for Summary Judgment with accompanying Memorandum of Law in Support via the Court's ECF System and that the same have thereby been served upon the following counsel of record, electronically:

Greg Harold Greubel, Esquire
Greubel Legal Services
744 South Street, Suite 715
Philadelphia, PA 19147

*Counsel to Plaintiff*

**FISHERBROYLES, LLP**

Dated:  <u>July 7, 2021</u>              By:  */s/ Sidney R. Steinberg*
Sidney R. Steinberg
sidney.steinberg@fisherbroyles.com
333 E. Lancaster Ave. #321
Wynnewood, Pa. 19096
610-806-5060

David E. Renner
david.renner@fisherbroyles.com
5990 University Boulevard, Box 148
Moon Township, PA 15108
412-746-1720

*Counsel to Defendant*